UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

RONALD EDWARD MARSHALL, II,      )
                                 )
                Plaintiff,        )        Case No. 1:13-cv-483
                                 )
v.                               )        Honorable Janet T. Neff
                                 )
COMMISSIONER OF                  )
SOCIAL SECURITY,                 )
                                 )        **REPORT AND RECOMMENDATION**
                Defendant.        )
_____)

This is a social security action brought under 42 U.S.C. §§ 405(g), 1383(c)(3) seeking

review of a final decision of the Commissioner of Social Security finding that plaintiff was not

entitled to disability insurance benefits (DIB) and supplemental security income (SSI) benefits.  On

July 16, 2009, plaintiff filed his applications for DIB and SSI benefits.[1]  (A.R. 66, 193-202).  He

alleged a July 30, 2008, onset of disability.  (A.R. 193).  He later amended his claims to allege a

June 24, 2009, onset of disability[2]  (A.R. 75).  Plaintiff's disability insured status expired on

September 30, 2009.  Thus, it was plaintiff's burden on his claim for DIB benefits to submit

_____

[1]July 16, 2009, is the protective filing date.  "Protective filing date" is the term used for the
first time an individual contacts the Social Security Administration about filing for benefits. *See*
http:// www.ssa.gov/glossary.htm (last visited Jan. 6, 2015).  A protective filing date allows an
individual to have an earlier application date than the date the signed application is actually filed.
*Id.*

[2]SSI benefits are not awarded retroactively for months prior to the application for benefits.
20 C.F.R. § 416.335;  *see Kelley v. Commissioner*, 566 F.3d 347, 349 n.5 (3d Cir. 2009); *see also
Newsom v. Social Security Admin.*, 100 F. App'x 502, 504 (6th Cir. 2004).  The earliest month in
which SSI benefits are payable is the month after the application for SSI benefits is filed.  Thus,
August 2009 is plaintiff's earliest possible entitlement to SSI benefits.

evidence demonstrating that he was disabled on or before September 30, 2009.  *See Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

Plaintiff's claims for DIB and SSI benefits were denied on initial review.  On November 1 and 3, 2011, he received a hearing before an administrative law judge (ALJ), at which he was represented by counsel.  (A.R. 38-103).  On December 28, 2011, the ALJ issued her decision finding that plaintiff was not disabled.  (A.R. 19-31).  On April 4, 2013, the Appeals Council denied review (A.R. 1-3), and the ALJ's decision became the Commissioner's final decision.

Plaintiff filed a timely complaint seeking judicial review of the Commissioner's decision.  Plaintiff argues that the Commissioner's decision should be overturned on the ground that the ALJ failed to properly weigh the medical opinion evidence.  (Plf. Brief at 1, docket # 14).  I recommend that the Commissioner's decision be affirmed.

## **Standard of Review**

When reviewing the grant or denial of social security benefits, this court is to determine whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner correctly applied the law.  *See Elam ex rel. Golay v. Commissioner*, 348 F.3d 124, 125 (6th Cir. 2003); *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001).  Substantial evidence is defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Heston v. Commissioner*, 245 F.3d 528, 534 (6th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see Rogers v. Commissioner*, 486 F.3d 234, 241 (6th Cir. 2007).  The scope of the court's review is limited.  *Buxton*, 246 F.3d at 772.  The court does not review the evidence *de novo*, resolve conflicts in evidence, or make credibility determinations.  *See Ulman v.*

*Commissioner*, 693 F.3d 709, 713 (6th Cir. 2012); *Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997). "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . . ." 42 U.S.C. § 405(g); *see McClanahan v. Commissioner*, 474 F.3d 830, 833 (6th Cir. 2006). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act without fear of court interference." *Buxton*, 246 F.3d at 772-73. "If supported by substantial evidence, the [Commissioner's] determination must stand regardless of whether the reviewing court would resolve the issues of fact in dispute differently." *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *see Gayheart v. Commissioner*, 710 F.3d 365, 374 (6th Cir. 2013)("A reviewing court will affirm the Commissioner's decision if it is based on substantial evidence, even if substantial evidence would have supported the opposite conclusion."). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Commissioner*, 336 F.3d 469, 477 (6th Cir. 2003); *see Kyle v. Commissioner*, 609 F.3d 847, 854 (6th Cir. 2010).

## Discussion

The ALJ found that plaintiff met the disability insured requirement of the Social Security Act from June 24, 2009, through September 30, 2009, but not thereafter. (A.R. 21). Plaintiff had not engaged in substantial gainful activity on or after June 24, 2009. (A.R. 21). Plaintiff had the following severe impairments: seizure disorder, depression, marijuana abuse, and cognitive disorder. (A.R. 21). Plaintiff did not have an impairment or combination of impairments

which met or equaled the requirements of the listing of impairments. (A.R. 22). The ALJ found that

plaintiff retained the residual functional capacity (RFC) for a limited range of light work:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he can never climb ladders, ropes, or scaffolds. The claimant should avoid all exposure to hazards, such as unprotected heights, moving machinery, and include all seizure precautions. He retains the capacity to perform non-production-paced work that is simple and unskilled. The claimant should not work in close proximity to co-workers, meaning he cannot function as a member of a team, and should have only occasional supervision and no contact with the general public. He is limited to low-stress work, meaning only occasional work changes and work-related decision-making, and should be allowed to make notes to aid memory.

(A.R. 24). The ALJ found that plaintiff's testimony regarding his subjective limitations was not

fully credible:

> The claimant's allegations regarding the intensity, persistence, and limiting effects of his impairments are not fully credible. Initially, the objective medical evidence of record does not document the frequency or severity alleged with respect to the claimant's seizures. Additionally, due to a history of non-compliance with medication, drug-seeking behavior, and inconsistent reports, the claimant's credibility is diminished.
>
> * * *
>
> The claimant's longitudinal treatment history also does not support the frequency of the seizure activity alleged. The claimant has alleged tonic-clonic (or grand mal) seizures occurring from daily to approximately twice per month, with petit mal seizures or "auras" sometimes several times daily. However, the claimant does not see a neurologist regularly, and has sought treatment for seizures no more often than every six-to-eight weeks (*See, e.g.*, Ex. 1F (July 1, 2008); 2F (January 7, 2009); 6F (June 3, 2009); 12F (September 6, 2009); 14F (October 8, 2009); 26F (November 12, 2009)). Additionally, with the exception of his seizure in November 2009, there have been no witnesses to the claimant's alleged seizures (Ex. 26F). Ms. Berlanga, the claimant's mother, testified that she might witness two seizures per month; however, the medical evidence is not consistent with this testimony.
>
> Moreover, there is reason to suspect that some of the reported incidents may not be seizure activity. For example, the claimant alleged daily "auras" to include a strange feeling in his abdomen and head, which he said preceded the tonic-clonic seizures occasionally. However, during video monitoring in August 2009, the claimant reported two such incidents, with no recorded evidence of epileptic activity or changes in his brain waves (Ex.10F). This evidence suggests that the claimant's alleged "auras," to the extent credible, may be

unrelated to seizure activity. Additionally, the claimant has frequently told his examining physicians that he believed he had a seizure due to the sudden onset of a headache, waking up in bed with a headache, or slight injuries (Ex. 6F; 11F; 29F). However, none of the claimant's examining physicians has observed focal neurological deficits of evidence of a postictal state (Ex. 1F; 2F; 6F; 12F; 14F; 26F; 29F). The claimant's assertion that he usually manages to get into bed by himself during a seizure is also not consistent with typical seizure activity (Ex. 29F).

The record also suggests that the claimant may exaggerate his seizure activity in order to receive narcotic pain medications. Specifically, the claimant has regularly reported to the emergency room following these episodes complaining of severe headaches or other pain, and requesting Dilaudid or morphine. For example, in April 2010, Diljit Karayil, M.D., the claimant's primary treating physician, noted that despite his complaints of uncontrolled epilepsy, he generally came to the clinic seeking pain medication (Ex. 28F). The claimant reported to both the emergency room and Dr. Karayil in February 2010, complaining of headaches and asking for Dilaudid or Demerol. Both Dr. Karayil and Robert Brandt, M.D., who treated the claimant in the hospital, noted that his behavior indicated drug seeking, rather than a legitimate need for pain medication (Ex. 28F; 29F). The record also documents an episode in October 2010, when the claimant became abusive to medical personnel who refused to provide him with narcotic pain medication (Ex. 29F). The observations of the claimant's treating and examining medical professionals call into question the legitimacy of his complaints of frequent seizure activity and severe head and body pain.

The claimant's credibility is damaged further by his failure to comply with recommended medical treatment. Initially, the undersigned notes that the claimant has left the hospital against medical advice on several occasions, generally after having been refused pain medication (Ex. 26F; 29F). Additionally, the claimant discontinued long-term video monitoring in August 2009 after only two days, although he was informed that he could not receive additional treatment without completing the study (Ex. 10F). Most significantly, the record reflects that the claimant has never complied with his prescribed medication for more than a few months at a time. For example, on consultation with Eugene Wiley, M.D., a neurologist, in February 2010, the claimant reported two generalized seizures in the past month, but acknowledged that he had taken no medication during this period. (Ex. 27F). The record reflects that many of the claimant's reported seizures have occurred during periods of noncompliance with medication (*See e.g.*, Ex. 2F (January 7, 2009); 6F (June 3, 2009); 27F (February 3, 2010; February 24, 2010)). Moreover, the claimant acknowledged in July 2011 that he self-medicates with marijuana, rather than taking his medication as prescribed (Ex. 35F). As noted above, there is no evidence that the claimant obtains the marijuana legally or that it is an effective treatment for his epilepsy. The claimant's failure

to comply with treatment, and particularly his insistence on using marijuana in place of his prescribed medications, weighs heavily against his overall credibility.[3]

The claimant's reported activities also weigh against his overall credibility. For example, he told Dr. Wiley that he was working for an electrician in February 2010, despite his assertions that he performed only odd jobs after the alleged onset date (Ex. 27F) Additionally, at a September 4, 2009, appointment, the claimant told Dr. Karayil that he played basketball regularly, for up to four hours at a time. Dr. Karayil also noted that the claimant appeared to be very athletic (Ex. 11F). However, the claimant's Adult Function Report, dated only 10 days after this appointment, indicates that he could not play any sports or perform strenuous activities due to his seizures (Ex. 4E). The claimant has also acknowledged the ability to help with housework and perform self-care activities independently. The inconsistency in the claimant's statements regarding his activities suggests that he is less limited than alleged.

(A.R. 24-30). The ALJ found that plaintiff could not perform any past relevant work. (A.R. 30).

Plaintiff was 30-years-old as of the date of his alleged onset of disability, 31-years old on the date

his disability insured status expired, and 33-years-old on the date of the ALJ's decision. Thus, at

all times relevant to his claims for DIB and SSI benefits, plaintiff was classified as a younger

individual. (A.R. 30). Plaintiff has a limited education and is able to communicate in English.

(A.R. 30). The ALJ found that the transferability of jobs skills was not material to a determination

of disability. (A.R. 30). The ALJ then turned to the testimony of a vocational expert (VE). In

response to a hypothetical question regarding a person of plaintiff's age with his RFC, education,

and work experience, the VE testified that there were approximately 3,400 jobs in Michigan's Lower

Peninsula that the hypothetical person would be capable of performing. (A.R. 56-58). The ALJ

---

[3]The ALJ went on to explain the host or reasons why she found that plaintiff's alleged limitations in concentration, cognitive functioning, and memory were not credible. (A.R. 27-28).

found that this constituted a significant number of jobs.  Using Rule 202.18 of the Medical-Vocational Guidelines as a framework, the ALJ found that plaintiff was not disabled.[4] (A.R. 30-31).

### 1.

Plaintiff argues that the ALJ committed reversible error by "not properly weighing" the medical opinion evidence.  (Plf. Brief at 1, Statement of Issue).  Specifically, plaintiff argues that the ALJ gave too little weight to the opinions of two consultative examiners, Psychologists James Lozer and Richard King, and that she gave too much weight to the opinions of non-examining medical experts, Glenn Douglas, M.D., and Psychologist Lisa Story.  (Plf. Brief at 3-13; Reply Brief, docket # 16).  I find no basis for disturbing the Commissioner's decision.

Plaintiff's burden on appeal is much higher than identifying evidence on which the ALJ could have made a factual finding in his favor.  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . .  This is so because there is a 'zone of choice' within which the Commissioner can act without fear of court interference."  *Buxton*, 246 F.3d at 772-73.  The Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of

---

[4]The administrative record is replete with evidence regarding plaintiff's substance abuse. Since 1996, the Social Security Act, as amended, has precluded awards of DIB and SSI benefits based upon alcoholism and drug addiction.  *See* 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J); 20 C.F.R. §§ 404.1535, 416.935; *see also Bartley v. Barnhart*, 117 F. App'x 993, 998 (6th Cir. 2004); *Hopkins v. Commissioner*, 96 F. App'x 393, 395 (6th Cir. 2004).  The claimant bears the burden of demonstrating that substance abuse was not a factor contributing to his disability.  *See Cage v. Commissioner*, 692 F.3d 118, 122-25 (2d Cir. 2012); *see also Zarlengo v. Barnhart*, 96 F. App'x 987, 989-90 (6th Cir. 2004).  Because plaintiff was found not to be disabled, the ALJ was not required to decide the issue of whether substance abuse was material to a finding of disability.  *See Gayheart v. Commissioner*, 710 F.3d at 380.

the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Commissioner*, 336 F.3d at 477.

The issue that plaintiff raises on appeal does not involve the treating physician rule. The treating physician rule did not apply to the opinions expressed by Psychologists Lozer and King because they were consultative examiners, not treating physicians. *See Smith v. Commissioner*, 482 F.3d 873, 876 (6th Cir. 2007); *see also Louden v. Commissioner*, 507 F. App'x 497, 498 (6th Cir. 2012); *Kornecky v. Commissioner*, 167 F. App'x 496, 506 (6th Cir. 2006). The rule did not apply to the non-examining medical experts because they had no treatment relationship with plaintiff. None of the restrictive opinions emphasized by plaintiff were the opinions of treating physicians. Thus, the ALJ was not "under any special obligation to defer to [those] opinion[s] or to explain why [s]he elected not to defer to [them]." *Karger v. Commissioner*, 414 F. App'x 739, 744 (6th Cir. 2011); *see Peterson v. Commissioner*, 552 F. App'x 533, 539 (6th Cir. 2014). Nonetheless, the ALJ carefully considered the opinions expressed by consultative examiners Lozer and King and found that they were not persuasive in light of the record as a whole.[5]

---

[5]Much of the evidence plaintiff filed in support of his claims for DIB and SSI benefits was generated before his alleged onset of disability. (*see, e.g.*, A.R. 305-26; 354-63; 379-83; 434-35; 645). This evidence is "minimally probative" because it falls outside the periods at issue, June 24, 2009, through September 30, 2009, on plaintiff's claim for DIB benefits, and through December 28, 2011, his claim for SSI benefits. *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988); *see also Van Winkle v. Commissioner*, 29 F. App'x 353, 358 (6th Cir. 2002). Suffice it to say that this evidence does not support plaintiff's claims for DIB and SSI benefits. Objective tests returned normal results. (*see e.g.*, A.R. 305, 354, 432). Emergency room physicians noted plaintiff's drug-seeking behavior and the questionable nature of his claims that he had experienced seizures. Progress notes dated July 1, 2008, provide a representative sample. On that date, plaintiff appeared at the Spectrum Health emergency room with some abrasions on his face and vague complaints that he had experienced a seizure. He related that he was not currently on any anti-epileptic medication and that he refused to take any such medications. Plaintiff claimed that he experienced one seizure per month. He complained of a headache "and specifically asked for Dilaudid, which he ha[d] been known to do so in the past[.]" (A.R. 307). Plaintiff stated that he smoked marijuana, but denied

Plaintiff claimed a June 24, 2009, onset of disability.  On June 24, 2009, plaintiff was examined by Darryl Varda, M.D., at Neurological Associates of West Michigan, P.C.  (A.R. 327-30).  Plaintiff's gait and muscle strength were normal.  (A.R. 329).  His neurological examination was "unremarkable.  (A.R. 327).  The MRI of his brain on June 29, 2009, returned normal results, with the exception of  a "minor mucoperiosteal thickening of the sphenoid sinus." (A.R. 331).  His EEG was normal, with no epileptiform or abnormal focal or slow activity noted.  (A.R. 332).  The MRI taken of plaintiff's brain on July 2, 2009, was normal (A.R. 547).  The EEG was likewise normal.  (A.R. 556).

On July 8, 2009, Muhammad Al-Kaylani, M.D., of the St. Mary's Neuroscience Program began treating plaintiff at the Epilepsy Clinic on a referral from Dr. Varda.  (A.R. 333).  Plaintiff reported having a grand mal seizure one day before this examination.  He complained of short-term memory problems.  He gave a history of intractable epilepsy with a variety of different types of seizures.  Dr. Al-Kaylani noted that plaintiff's EEG and brain MRI had returned normal results.[6]  (A.R. 334).  He found that plaintiff was in no apparent distress and was oriented in all three spheres.  "Muscle tone examination showed normal tone and bulk within the upper and lower extremities.  Muscle strength testing revealed 5/5 power within the upper and lower extremities.  Deep tendon reflexes were 2/4 throughout."  (A.R. 335).  Dr. Al-Kaylani explained available

_____

using any other illicit drugs.  Although plaintiff had an earlier drug screen which had been "positive for cocaine," he adamantly denied cocaine use.  Plaintiff's CT scan returned normal results.  Plaintiff was treated with Tylenol, but he became upset and verbally abusive when doctors refused to give him any stronger pain medication.  Lawrence Donley, M.D., offered a diagnosis of a "[q]uestionable history of a seizure disorder" and "[n]arcotic-seeking behavior."  (A.R. 307).

[6]In response to the ALJ's questions, plaintiff's attorney conceded that no medical professional had ever observed plaintiff experience a seizure.  (A.R. 71).

treatment options, including surgery if plaintiff qualified as a candidate for such a procedure.  Dr.

Al-Kaylani began a diagnostic work-up, which included admission to the Epilepsy Monitoring Unit

"to record some of his seizures and to localize the epileptogenic focus."  (A.R. 335).  He also

prescribed Depakote Extended Release and Keppra. (A.R. 335).  Plaintiff reported "two subjective

events (Auras), where he reported that he had a brief sensation rising in his head in both events."

(A.R. 337).  "There was no EEG change in association with two subjective events that the patient

counted [] as auras." (A.R. 338).  Dr. Karayil observed "no epileptiform discharges."  (A.R. 337).

Plaintiff's continuous EEG monitoring study was "normal in walking, drowsiness and sleep."  (A.R.

337).  Plaintiff decided to terminate a video EEG study before it could be completed:

> [P]atient terminated the study very early because he wanted the EKG electrodes to be
> removed otherwise he w[ould] leave.  We explained to him the EKG electrodes need to be
> kept since it is part of the recording protocol and it is a hospital policy for patient's safety,
> since there is a risk of cardiac arrhythmias or even risk of cardiac arrest during seizures.
> However, he decided to leave against medical advice, and he fully understands that I cannot
> complete diagnostic workup before completing this VEEG study to record clinical seizures
> since he wants to go through with epilepsy surgery.  Therefore he needs to go back to his
> regular neurologist.  Patient expressed that he fully understands that he needs to continue
> following seizure[] precautions and to continue taking antiseizure medications as prior to
> admission.

(A.R. 338).  Plaintiff's non-compliant behavior undermined the attempt to determine whether he

was a candidate for epilepsy surgery.  On August 27, 2009, the Epilepsy Clinic discharged plaintiff

as a patient.  (A.R. 673).

On September 4, 2009, plaintiff received a preoperative examination for a scheduled

surgery on his deviated nasal septum.  Plaintiff denied any history of headaches.  He stated that he

had been playing basketball and could play "up to 3-4 hours," which indicated "a very high exercise

tolerance."  (A.R. 342).  Plaintiff reported no history of head injuries and he did not have any

developmental delays.  (A.R. 342).  He did not have photophobia.  Plaintiff stated that he smoked

more than a pack of cigarettes per day and that he occasionally drank alcohol.  He reported that he had smoked marijuana in the past "to boost his appetite," but denied current use.  (A.R. 343). Plaintiff's EKG and physical examination were unremarkable. (A.R. 343).  On September 16, 2009, Andrew Barak, D.O., performed nasoseptoplasty surgery to correct plaintiff's deviated nasal septum. (A.R. 500-01).

On September 6, 2009, plaintiff appeared at the emergency room at St. Mary's Hospital.  He reported that he suffered a seizure earlier in the day and that he now had a diffuse headache.  (A.R. 366).  He denied alcohol or drug use.  (A.R. 367).  Plaintiff stated that he had missed a dose of Keppra.  Because it was possible that the seizure that plaintiff reported was related to his non-compliance, he was given a dose of Keppra and discharged.  (A.R. 367-68).  Plaintiff's disability insured status expired on September 30, 2009.

On October 8, 2009, plaintiff appeared at the emergency room at St. Mary's Hospital. (A.R. 388).  Plaintiff reported that he had suffered a seizure five hours before his arrival.  He reported that he had a headache.  His physical examination was unremarkable.  He continued to use marijuana.  Plaintiff requested narcotic pain medication for his headache.  The physician reviewed plaintiff's records and noted that he had "asked for narcotics on multiple occasions and that he ha[d] been suspected of having narcotic seeking behavior."  (A.R. 390).  When the physician advised plaintiff to take Motrin or Tylenol, plaintiff's response was, "Dilaudid is the only thing that works for me."  (A.R. 390).  The physician declined to provide plaintiff with Dilaudid.  (A.R. 390-91).

On November 11, 2009, plaintiff received a consultative examination performed by Psychologist James Lozer.  (A.R. 422-28).  Plaintiff reported that he was experiencing crying spells and having trouble sleeping.  Incredibly, plaintiff told Lozer that his last use of marijuana had been

about a year earlier when he was "smoking about 1 joint per day." (A.R. 423). Plaintiff conceded

that he performed handyman jobs from time to time to earn some spending money. (A.R. 424). He

spent most of his time during the day "watching television, playing video games and visiting with

his family members." (A.R. 425). He appeared to have at least an average IQ. (A.R. 425).

Psychologist Lozer offered a diagnosis of an adjustment disorder with depressed mood and gave

plaintiff a global assessment of functioning (GAF) score of 52.[7] (A.R. 427).

On November 12, 2009, plaintiff appeared at St. Mary's Hospital and claimed that

earlier that day he had experienced an aura and a grand mal seizure. The CT scan of plaintiff's head

---

[7]GAF scores are subjective rather than objective assessments and are not entitled to any particular weight. *See Kornecky v. Commissioner*, 167 F. App'x 496, 511 (6th Cir. 2006). "GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations." *White v. Commissioner*, 572 F.3d 272, 276 (6th Cir. 2009). "GAF is a clinician's subjective rating of an individual's overall psychological functioning. A GAF score may help an ALJ assess mental RFC, but it is not raw medical data. Rather, it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning." *Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007); *see Kornecky*, 167 F. App'x at 503 n. 7. The DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS' (DSM–IV's) explanation of GAF scale indicates that "a score may have little or no bearing on the subject's social and occupational functioning." *Kornecky*, 167 F. App'x at 511; *see Oliver v. Commissioner*, 415 F. App'x 681, 684 (6th Cir. 2011). "Significantly, the SSA has refused to endorse the use of the GAF scale." *Bennett v. Commissioner*, No. 1:07-cv-1005, 2011 WL 1230526, at * 3 (W.D. Mich. Mar. 31, 2011).

"[T]he latest edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM) no longer includes the GAF scale." *Davis v. Commissioner*, No. 1:13-cv-1556, 2014 WL 4182737, at * 8 (N.D. Ohio Aug. 21, 2014); *see Finley v. Colvin*, No. 12-7908, 2013 WL 6384355, at * 23 n. 9 (S.D.W.V. Dec. 5, 2013) ("It should be noted that in the latest edition of the [DSM], the GAF scale was abandoned as a measurement tool."). " 'It was recommended that the GAF be dropped from the DSM-5 for several reasons, including its conceptual lack of clarity ... questionable psychometrics in routine practice.' " *Brown v. Colvin*, No. 12-513, 2013 WL 6039018, at * 7 n. 3 (E.D. Wash. Nov.14, 2013) (quoting DSM ,16 (5th ed., 2013)). "Moreover, a GAF score reflected an individual's functioning at a particular moment in time; one score was generally not helpful in determining whether Plaintiff's alleged impairment lasted at least 12 months, as is required to be considered disabled. *See* 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 416.905(a)." *Davis v. Commissioner*, 2014 WL 4182737, at * 8.

returned normal results.  (A.R. 520).  Plaintiff was treated with Dilaudid, morphine, and Toradol and discharged.  (A.R. 519).  On December 7, 2009, plaintiff reported that he had experienced another seizure and complained of a headache.  Another CT scan of his head returned normal results.  (A.R. 532).  Plaintiff claimed that he spilled his Keppra tablets into the sink and did not actually take the medication.  The emergency room physician noted:  "The patient now presents for an evaluation of that seizure at approximately quarter to 6 p.m. and it is not clear what exact[ly] the patient was doing for most of the day[] since this seizure allegedly occurred in the morning."  (A.R. 529).  Plaintiff was treated with Dilaudid and Toradol.  Plaintiff then complained that he wanted to go to McDonald's to get something to eat and he wanted to smoke.  He  insisted on signing out of the hospital against medical advice.  (A.R. 527).

On November 24, 2009, Glen Douglas, M.D., a medical consultant, reviewed plaintiff's medical records and offered his opinion that plaintiff was capable of performing work which did not require climbing ladders, ropes, or scaffolds.  Further, given plaintiff's alleged seizure disorder, "he should not work at unprotected heights or around moving machinery."  (A.R. 436-43).

On December 22, 2009, Psychologist Glen Peterson performed a consultative examination.  Plaintiff disclosed that he had worked for about three months during the year as an electrician.  (A.R. 461).  Plaintiff reported that he smoked marijuana and expressed his belief that it was helpful, "especially for morning nausea."  (A.R. 461).  Plaintiff's test scores were unreliable. Psychologist Peterson noted:  "It is impossible for me to know with certainty that this is evidence of malingering, but it is either malingering, or possibly the adoption of an attitude towards test taking."  (A.R. 463).  Peterson offered a diagnosis of "some type of cognitive disorder with unknown etiology which could be medical or psychological, or even the result of drug abuse."  (A.R. 464).

-13-

On January 6, 2010, Psychologist Lisa Story, a medical consultant, reviewed plaintiff's records and offered her opinion that plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods, work in coordination or proximity to others without being distracted by them, and interact appropriately with the general public.  (A.R. 466-69).

On January 7, 2010, plaintiff returned to the emergency room at St. Mary's Hospital. (A.R. 538).  He complained that a day earlier he had a seizure.  He disclosed that he was not taking any anti-seizure medication.  He continued to smoke marijuana and cigarettes, and the attending physician "counseled him against both."  (A.R. 538).  Plaintiff's CT scan revealed no acute intracranial abnormality.  (A.R. 540).  He was treated with Benadryl, Toradol, and Compazine. (A.R. 539).

On February 3, 2010, plaintiff appeared at Spectrum Health.  He stated that he was "now working as an electrician."  (A.R. 559).  He reported that he needed marijuana  "every morning to get his appetite started."  He claimed that he was afraid to take anti-depressants "because of their risk of seizure."  D. Eugene Wiley, M.D., noted:  "The patient attributes his seizures to when he began taking Wellbutrin plus smoking cessation years ago."  (A.R. 559).  Plaintiff reported that he was applying a second time for disability and claimed that he had been told by unspecified physicians that he should not work.  (A.R. 559).

On February 17, 2010, plaintiff related to physicians at Spectrum Health that when he went to St. Mary's Hospital  "the other day" he was given a chronic pain agreement to be filled out by his physician because plaintiff was complaining of a post-seizure headache and "was requesting [the] morphine cocktail he 'always gets.'"  (A.R. 563).

On February 15, 2010, plaintiff appeared at the Spectrum Health emergency department.  He complained of another "unwitnessed seizure."  (A.R. 588).  Plaintiff complained of a headache and was "requesting and even demanding Dilaudid by name[.]" (A.R. 588).  On examination, plaintiff's strength in his upper and lower extremities was 5/5.  "The patient was noted to be walking through the Emergency Department with absolutely no difficulty."  (A.R. 589).  Robert Brandt, M.D., noted that plaintiff was requesting Dilaudid by name.  (A.R. 589).  Dr. Brandt expressed discomfort about giving plaintiff Dilaudid, but elected to give plaintiff the benefit of a doubt, and he initially approved 2 Vicodin tablets.  When nursing staff came in to perform a blood draw for laboratory studies, plaintiff stated that he wanted to leave.  He left the emergency department, but then returned and agreed to treatment with the Benadryl, Compazine, and Toradol which was the medication he received during his most recent visit.  When nursing staff returned to administer the medications, plaintiff stated that he wanted to "leave against medical advice again if [they] were not going to give him Dilaudid."  (A.R. 589).  Plaintiff left again, then returned for a third time and became verbally abusive.  Dr. Brant informed plaintiff that he would "not be getting any Dilaudid here."  Plaintiff was  "swearing and using profanity" as he left the emergency room.  Dr. Brandt expressed his opinion that plaintiff had been feigning the story about having a seizure in order to obtain drugs: "The patient does leave the Emergency Department against medical advice. I do feel as though this patient's story is concerning for drug-seeking behavior due to the fact that the patient did not know the names of any type of antiepileptic drugs that he was on or know his neurologist's name; however, he did know the name of Dilaudid pain medication by name." (A.R. 589).

On February 18, 2010, plaintiff appeared at the Ferguson Clinic.  Plaintiff related that

-15-

Dilaudid and Demerol provided post-seizure relief.  Dr. Karayil informed plaintiff that his pain could be treated with non-steroidal anti-inflammatory drugs (NSAIDS).  Plaintiff did not require higher pain medications such as Dilaudid and Demerol.  Nonetheless, plaintiff requested prescriptions for Dilaudid and Demerol.  Plaintiff was described as an "extremely noncompliant patient."  (A.R. 572).  Plaintiff reported that he had stopped using marijuana to enhance his appetite.  (A.R. 572).  Dr. Karayil informed plaintiff that he would not be receiving prescriptions for Dilaudid or Demerol.  He stated, "I do suspect that he has drug seeking behavior."  (A.R. 573).

On February 23, 2010, plaintiff appeared at Gastroenterology Associates and requested a consultation.  He complained of morning nausea and stated that marijuana use each morning "seem[ed] to resolve his nausea rather quickly."  (A.R. 569).  He was "interested in obtaining medical marijuana."  (A.R. 569).  In addition to his self-medication with marijuana, plaintiff disclosed past intranasal cocaine use.  (A.R. 570).

Spectrum Health progress notes dated February 24, 2010, indicate that plaintiff's primary care physician was terminating him as a patient because he continued to make frequent trips to the emergency room to obtain a "morphine cocktail or Dilaudid."  (A.R. 564).  On February 24, 2010, doctors at Spectrum Health advised plaintiff that they would not approve a narcotic agreement and would not provide him with narcotic medications.  (A.R. 565).

On March 24, 2010, plaintiff reported to emergency room physicians at St. Mary's Hospital that a month earlier he had stopped taking his prescription medications and was doing well.  He stated that he had experienced a seizure and that he had a typical headache afterwards.  He also expressed concern that he may have injured his neck or right shoulder.  (A.R. 592).  A CT scan and X-rays returned normal results.  (A.R. 594, 596-97).  Plaintiff displayed a normal mental status and

normal neurologic examination.  He was discharged and advised to follow-up with his primary care physician.  (A.R. 594-95).

On April 14, 2010, plaintiff's treating physician, Dr. Karayil, described him as an "extremely noncompliant patient."  (A.R. 568).  Plaintiff was noncompliant "in the taking of his medications and follow up."  (A.R. 568).  Plaintiff repeated his requests for Dilaudid and Demerol.  Dr. Karayil reiterated that the Ferguson Clinic would not provide Dilaudid and Demerol.  Plaintiff denied any history of dizziness or loss of consciousness.  He denied any history of headaches.  He denied any history of urinary or bowel incontinence.  Dr. Karayil noted that plaintiff "had an appointment with neurology which he apparently did not keep.  He was put on Lamictal which he apparently did not take stating that after he stopped taking Lamictal he has been feeling well. . . . The patient also has a history of depression but he refuses to take any antidepressants. . . .  [I]t is very difficult to formulate whether the patient actually is looking for help for his seizures as most of the time he is in the clinic he is asking for pain medications rather than seizure medications."  (A.R. 568).  Dr. Karayil informed plaintiff "that it [was] very important that he should take his medications but he [] refus[ed] stating that ever since he stopped taking Lamictal he has been feeling better."  (A.R. 568).  Dr. Karayil invited plaintiff to seek another primary care physician and informed him of the procedure for obtaining copies of his medical records:  "Again we did explain to the patient about our narcotic policy.  I again reemphasized with the patient that if he was not happy with the care in the clinic he could probably seek another primary care provider[.]"  (A.R. 568).

On May 21, 2010, plaintiff appeared at St. Mary's Hospital and complained of a headache following two alleged seizures. He received prescriptions for Vicodin, Flexeril, and Depakote and was advised to follow-up with his primary care physician. (A.R. 601-04).

On July 7, 2010, plaintiff returned to St. Mary's stating that he thought that he had experienced a seizure. He reported a headache. He stated that he continued to smoke cigarettes and rarely drank alcohol. He stated that he "smokes pot very regularly." (A.R. 606). Another CT scan of his brain returned normal results. (A.R. 608). Plaintiff received "4 mg of Zofran, 30 mg of Toradol, 1 mg of Ativan and 2 Vicodin for his pain." (A.R. 607). Plaintiff reported that he felt better and was discharged in stable condition. Dr. Brandt reiterated that plaintiff should stop self-medicating with marijuana because it was not "an excellent drug of choice for his seizures." (A.R. 607).

On September 5, 2010, plaintiff returned to St. Mary's. He alleged that he had experienced a seizure while playing an online video game. He again complained of a headache and requested narcotics. He denied use of drugs or alcohol. He did state that he "use[d] marijuana for his seizures." (A.R. 615). Plaintiff was treated with Toradol. In addition, plaintiff requested a muscle relaxant and was discharged with a prescription for Flexeril. (A.R. 616). The treating emergency room physician, Mark T. Miller, D.O., cautioned plaintiff against his ongoing use of marijuana for self-medication because "marijuana generally lowers the seizure threshold." (A.R. 616).

Plaintiff next appeared at the St. Mary's emergency room on October 29, 2010. He claimed that he had experienced another unwitnessed seizure. (A.R. 619). He did not suffer any seizures while he was in the emergency room and a comprehensive metabolic panel returned normal

results. (A.R. 621). It was noted that plaintiff was not taking any anti-seizure medications and that he had "declined it in the past." When questioned about this behavior, plaintiff responded that he "self prescribes marijuana, which ha[d] been working very well." (A.R. 619). Plaintiff once again complained of post-seizure pain and requested "narcotics such as Dilaudid by name [] for his seizure pain. He state[d] that Dilaudid and morphine ha[d] worked the best in the past[.]" (A.R. 619). The attending physician, Jennifer Ekkins, D.O., informed plaintiff that she would not be giving him any type of narcotics for his alleged headaches. (A.R. 620). Dr. Ekkins offered a diagnosis of marijuana abuse. She gave plaintiff Tylenol and told him that he needed to see a neurologist for the unwitnessed seizures that he continued to report. (A.R. 620). When plaintiff reported that he no longer had a primary care physician, he was advised of a number of local medical clinics where he could obtain treatment. (A.R. 621). Plaintiff became "very rude" when he discovered that he would not be receiving any narcotics. He stated: "'fine, do not give me any medications, I want to leave right now' and proceeded to tear out his IV." (A.R. 621). He then demanded to see a "supervisor." (A.R. 621).

On July 31, 2011, plaintiff appeared at the Spectrum Health emergency department. He stated that he had experienced a seizure and complained of neck pain and a headache. He stated that he continued to self-medicate with marijuana on a daily basis: "[A]ccording to the patient, he was previously prescribed anti-seizure medications but reported that 'none of these worked.' He currently takes marijuana daily for these seizures." (A.R. 681). X-rays revealed no evidence of cervical spine fracture. Plaintiff received a Vicodin and indicated that he felt better. He then "left the emergency department without informing anyone." (A.R. 681).

-19-

On October 6, 2011, plaintiff reported to a Network 180 employee that he "use[d] marijuana daily" and claimed that it had been prescribed by physicians for epilepsy.  (A.R. 630). He  denied any history of psychiatric hospitalizations.  (A.R. 632).  He declined crisis intervention and was scheduled for an appointment with Dr. Munir on October 13, 2011.  (A.R. 632).

On October 12, 2011, Limited License Psychologist[8] Richard King conducted a consultative examination on a referral from plaintiff's attorney.  (A.R. 637-43).  Plaintiff reported that he was not taking any anti-seizure medication.  (A.R. 638).  He related that he used marijuana "five out of seven days for his seizures" and stated that "it help[ed]."  (A.R. 638).  Plaintiff stated that several years earlier, he "took a bunch of illegal drugs."  (A.R. 638).  He reported anxiety but was not taking any medication for it.  He did disclose that he used marijuana "as a way to 'self-medicate' his seizure disorder and his anxiety."  (A.R. 639).  He "report[ed] that he did go to Network 180 several times, but the psychologists are 'crackhead clinics.'" (A.R. 638).  Psychologist King conceded that plaintiff's scores on the WAIS-IV tests "suggest[ed] a question regarding validity."  (A.R. 639).  Nonetheless, King offered his opinion that plaintiff's low test scores on several subtests were the result of "emotional dysfunctions affecting concentration and focusing," rather than "purposefully subverting the test results."  (A.R. 639).  King offered an opinion that plaintiff could "actually read at a higher level than what the reading test revealed."  (A.R. 640). King offered a diagnosis of a dysthymic disorder, moderate, generalized anxiety disorder, panic disorder with agoraphobia, cannabis abuse (episodic type), mild mental retardation, histrionic personality disorder, and dependent personality disorder.  He gave plaintiff a current GAF score of 47.  (A.R. 643).  King completed a RFC questionnaire for plaintiff's attorney in which he offered

---

[8]King worked under the supervision of a licenced psychologist, Wayne Kinzie.  (A.R. 643).

opinions that plaintiff had "marked" or "extreme" limitations in every category listed. (A.R. 635-36). The ALJ carefully considered all the evidence presented. She determined that the restrictive assessments by provided consultative examiners that plaintiff now emphasizes were entitled to little weight:

> The record [] does not support the limitations in the claimant's concentration and cognitive functioning beyond those in the residual functional capacity above. Initially, although the claimant alleged two suicide attempts in 2006, the record is devoid of evidence of counseling or inpatient psychiatric treatment. Significantly, the claimant told Dr. Lozer, the psychological consultative examiner, that he refused to take antidepressants, due to fear of increased seizure activity (Ex. 16F). In October 2011, the claimant's representative referred him for crisis counseling, due to complaints of rapidly cycling moods, erratic behavior, and crying spells. However, the claimant declined crisis counseling, and there is no evidence that he followed up with any mental health professional (Ex. 31F). The claimant's failure to obtain appropriate treatment for his alleged depression suggests that it does not cause additional limitations.

> The record also does not support the claimant's allegations with respect to his memory problems. At the psychological consultative examination, Dr. Lozer noted that the claimant became tearful easily, and had serious problems with recent memory. Dr. Lozer also observed that the claimant's speech was slow; however, his thoughts were coherent, and Dr. Lozer estimated his IQ to be average. Additionally, despite the claimant's poor delayed memory, he could name past presidents and perform simple calculations (Ex. 16F). The undersigned has considered the claimant's subjective complaints in restricting him to unskilled work that would allow him to take notes to aid his memory. However, additional persuasive medical evidence suggests that the claimant may exaggerate his mental symptoms, which limits his overall credibility.

> The claimant underwent cognitive testing in December 2009 and October 2011. Dr. Peterson, who conducted the December 2009 evaluation at the request of the State agency, noted that the claimant performed very poorly on the Wechsler Memory Scale; however, his Working Memory score was near the average range. Dr. Peterson also noted significant performance inconsistencies within individual subtests. Although Dr. Peterson did not conclude that the claimant was malingering, he stated that the claimant's performance was evidence of either malingering or a bad attitude toward test-taking (Ex. 21F). Additionally, on intelligence testing in October 2011, Dr. Kinzie reported evidence of symptom exaggeration, including what he described as "self-dramatizing" and attention-seeking behavior on the part of the claimant. Moreover, Dr. Kinzie observed that the claimant reported confusion regarding a specific subtest, despite having already completed nine test items. Dr. Kinzie also noted that the claimant appeared to read at a higher level than indicated by his test results.

Dr. Kinzie ultimately concluded that the claimant's results were valid, citing problems with concentration related to emotional problems (Ex. 32F). However, neither Dr. Lozer nor the claimant's neurologists have reported serious concentration problems during the relevant period (Ex. 7F; 16F). The claimant's limited mental health treatment also does not support Dr. Kinzie's assessment of debilitating emotional issues. Furthermore, both Dr. Kinzie and Dr. Peterson reported significant evidence of exaggeration, testing inconsistencies, and abnormal behaviors, which taint the validity of these tests. Based on the consistent findings of memory problems on neurological and mental status examination, the claimant can perform only unskilled, low-stress work. Nonetheless, the undersigned has not accepted Dr. Kinzie's conclusion that the claimant's mental impairments cause extreme limitations in his ability to concentrate.

As for the opinion evidence, in November 2009, Glen Douglass, M.D., the State agency medical consultant, determined that the claimant had no exertional limitations, although he should avoid all exposure to hazards (Ex. 18F). The undersigned has given Dr. Douglass's opinion some weight. This opinion is generally consistent with the undersigned's assessment of the claimant's credibility. However, viewing the evidence in the light most favorable to the claimant, his seizure disorder does limit him to light work not requiring the climbing of ladders, ropes, or scaffolds, or working around debris.

In January 2010, Lisa Story, Psy.D., the State agency psychological consultant, concluded that the claimant could perform simple, routine, repetitive tasks, with normal pace, but might work best in isolation or in small groups (Ex. 22F). The undersigned has given Dr. Story's opinion significant weight. She reviewed all the available evidence, and her opinion is based on that review and her knowledge of the disability program and its requirements.

Dr. Lozer, the psychological consultative examiner, opined that the claimant could not perform full-time work until his seizure disorder was controlled. Additionally, Dr. Lozer gave the claimant a Global Assessment of Functioning (GAF) score of 52 (Ex. 16F). GAF scores between 51 and 60 typically correlate to moderate symptoms or moderate functional limitations.. The undersigned has given Dr. Lozer's opinion limited weight. Initially, Dr. Lozer's assertion that the claimant's seizure disorder precluded work activity relates to a matter reserved to the Commissioner,[9] and is entitled to no particular weight. Moreover, Dr. Lozer is not a neurologist or other medical expert, and is not qualified to assess the effect of the claimant's seizures on his ability to work. The undersigned also notes that the GAF score is a subjective impression of the claimant's functioning based on only one evaluation. Therefore, such a score does not necessarily reflect the claimant's functioning over time.

In October 2011, Dr. King opined that the claimant's mental impairments would cause marked or extreme limitations in almost every area necessary to perform unskilled work. (Ex. 34F). Additionally, Dr. Kinzie gave the claimant a GAF score of 47, noting that he would have significant difficulty meeting the social and concentration demands of

_____

[9]*See* 20 C.F.R. §§ 404.1527(d), 416.927(d).

competitive employment (Ex. 32F). GAF scores between 41 and 50 typically correlate to serious symptoms or serious functional limitations. The undersigned has considered these opinions, but they are entitled to very little weight. Drs. King and Kinzie interviewed the claimant only once, and the record does not provide a basis for their clinical conclusions. Moreover, Dr. King did not give specific work related limitations related to the claimant's impairments. The undersigned does not find these opinions credible evidence of the claimant's ability to perform work-related mental activities.

(A.R. 28-29).

Plaintiff is correct that an examining relationship is one of the factors an ALJ is to consider when weighing medical opinions.[10] *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); *see also McClean v. Colvin*, No. 3:11-cv-236, 2013 WL 4507807, at * 8 (M.D. Tenn. Aug. 23, 2013) ("[R]espective examining and non-examining status [is] only one of several relevant factors[.]"). Consistency is another important factor: "Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4). In addition, "Social Security regulations recognize that opinions from non-examining state agency consultants may be entitled to significant weight, because these individuals are 'highly qualified' and are 'experts in Social Security disability evaluation.'" *Cobb v. Commissioner*, No. 1:12-cv-2219, 2013 WL 5467172, at * 5 (N.D. Ohio Sept. 30, 2013) (quoting 20 C.F.R. §§

---

[10]There is no precise formula for "correct balancing" of the factors, and the ALJ's factual finding is reviewed under the deferential "substantial evidence" standard. *See Cole v. Astrue*, 661 F.3d 931, 937-38 (6th Cir. 2011). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Heston v. Commissioner*, 245 F.3d at 534. Under sections 404.1527(c) and 416.927(c), the ALJ is only required to "consider" the factors. The regulation does not require a "factor-by-factor" analysis. *See Francis v. Commissioner*, 414 F. App'x 802, 804-05 (6th Cir. 2011); *see also Kostovski-Talevska v. Commissioner*, No. 5:13-cv-655, 2014 WL 2213077, at * 9 (N.D. Ohio May 28, 2014) (collecting cases); *Owens v. Commissioner*, No. 1:12-cv-47, 2013 WL 1304470, at * 2 (W.D. Mich. Mar. 28, 2013) (same). The ALJ recognized that Dr. Douglas was Psychologist Story were medical consultants, not consultative examiners. (A.R. 27-28). Nothing in the applicable case law or regulations require that an ALJ burden her opinion with useless surplusage stating that non-examining physicians and psychologists lack an examining relationship with the claimant.

404.1527(e)(2)(i), 416.927(e)(2)(i)); *see Barker v. Shalala*,  40 F.3d 789, 794 (6th Cir. 1994); *see also Brooks v. Commissioner*, 531 F. App'x 636, 642 (6th Cir. 2013) ("[I]n appropriate circumstances, opinions from State agency medical and psychological consultants . . . may be entitled to greater weight than the opinions of treating or examining sources.").  The ALJ is responsible for weighing conflicting medical opinions.  *See Buxton*, 246 F.3d at 775; *see also Reynolds v. Commissioner*, 424 F. App'x 411, 414 (6th Cir. 2011) ("This court reviews the entire administrative record, but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ.").  I find no error in the weight the ALJ determined was appropriate for the opinions found in this administrative record.

## 2.

Plaintiff argues that the ALJ "mischaracterized" the evidence when she stated Psychologist King did not provide specific work-related limitations.  (Plf. Brief at 10-11; Reply Brief at 2).  Plaintiff objects to a sentence on page 11 of the ALJ's 13-page opinion in which she stated that "King did not give specific work-related limitations related to the claimant's impairments."  (A.R. 29).   King, a consultative psychologist, completed a two-page RFC questionnaire:  the first page is a check-the-box form (A.R. 635), and the second page repeats the suggested restrictions and references various sections of King's consultative examination report.  (A.R. 636).  King's RFC questionnaire responses were not entitled to any particular weight.  RFC is an administrative issue reserved to the Commissioner.  20 C.F.R. §§ 404.1527(d)(2), (3), 416.927(d)(2), (3).  RFC is the most, not the least, a claimant can do despite his impairments.  20

C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); *Branon v. Commissioner*, 539 F. App'x 675, 677 n.3 (6th Cir. 2013); *Griffeth v. Commissioner*, 217 F. App'x 425, 429 (6th Cir. 2007). The ALJ's statement that King did not suggest "specific work-related limitations" was not accurate. However, the ALJ's factual finding that the "marked or extreme" RFC limitations that King suggested were entitled to very little weight because King saw plaintiff only once, and the record as a whole did not support the limitations that he suggested (A.R. 29), is supported by more than substantial evidence.

**3.**

Plaintiff argues that the ALJ erred by applying "more rigorous scrutiny" to the opinions of examining consultants than non-examining consultants. (Plf. Brief at 13; Reply Brief at 3) (citing *Gayheart v. Commissioner*, 710 F.3d 365 (6th Cir. 2013)). Plaintiff's argument that cannot withstand scrutiny. The Sixth Circuit's decision in *Gayheart* supports rather than undermines the ALJ's decision. In *Gayheart*, the Sixth Circuit recognized that the opinions of treating sources are generally given greater weight than the opinions of examining sources. *Id.* at 375. Plaintiff's Brief and Reply Brief ignore the opinions of plaintiff's treating and examining physicians which document his drug seeking behavior, his persistent use of marijuana to self-medicate rather than taking prescribed anti-seizure medications, and the questionable legitimacy of his complaints of frequent seizure activity, severe headaches, and body pain. The ALJ found that these opinions were compelling. (A.R. 26-27). Further, the "scrutiny" error in *Gayheart* was that the ALJ was too critical of inconsistencies between the opinions of Dr. Onady (a treating psychiatrist) and the other record evidence, and ignored "equivalent inconsistencies on the opinions of the consultative

doctors."[11] 710 F.3d at 379.  Here, the ALJ gave a balanced review of the record evidence and found

that plaintiff was not disabled.  The ALJ's decision easily withstands scrutiny under the deferential

"substantial evidence" standard of review.  "  *Jones v. Commissioner*, 336 F.3d at 477.


### Recommended Disposition

For the reasons set forth herein, I recommend that the Commissioner's decision be

affirmed.


Dated:   January 8, 2015                       /s/  Phillip J. Green_____
                                                      United States Magistrate Judge


### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within
fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All
objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file
timely and specific objections may constitute a waiver of any further right of appeal.  *See Thomas
v. Arn*, 474 U.S. 140 (1985); *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 458 (6th Cir.
2012); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir. 2008).   General objections do not
suffice. *See McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier
Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).

---

[11] In *Gayheart*, a consultative physician offered an opinion at one hearing that the claimant
met the requirements of a listed impairment, and at the next stated that there was "insufficient
evidence to show that a mental listing was met or equaled."  710 F.3d at 379.  The ALJ "either
overlooked or accepted this stark change in opinion regarding one of the fundamental issues in the
case without any explanation for that change."  *Id.*

-26-